Judge Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA, Plaintiff,

vs.

COVA CAMPBELL, a/k/a Cova Hunter, Defendant.

NO. CR20-5065RJB

DEFENDANT'S SENTENCING MEMORANDUM

## INTRODUCTION

On January 15, 2021, Ms. Campbell pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343. In her plea agreement, Ms. Campbell acknowledged enumerated facts set forth in the plea agreement as the basis for her guilty plea, and she acknowledges her misconduct. She has further acknowledged the conduct during her interview by U.S. Probation, as memorialized in the Pre-Sentence Report. And she will do so again before this court at sentencing. The extremely remorseful Cova Campbell is now prepared for sentencing. The defense respectfully recommends this Court impose a sentence that includes 37 months incarceration.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

## BACKGROUND INFORMATION

The defense has chosen to include a comprehensive view of Ms. Campbell's history. The point of the narrative is two-fold: (1) to support the view that Ms. Campbell's criminal acts were something other than pure greed, but included judgment that was clouded by a near-lifetime of trauma and adverse experiences; and (2) to provide the court a thorough view of the experiences the court can now help Ms. Campbell address while crafting the most appropriate sentence.

Cova Campbell is one of four children born to the multiple marriages of their two parents, Richard, and Mona Hunter. Richard met Mona when he was stationed in South Korea with the Marines. Mona, having lost her parents during her childhood, raised her younger brother, was not afforded an education, and, at 27, married Cova's father – for the first time. Their relationship was volatile. They had four children, and they divorced three times and remarried each time. The children to Richard and Mona included Richard, Jr. (5 years older than Cova), Cova, Mona, and Emmett, both younger than Cova.

As noted in the PSR, Mona has been a point of contact for verifying information provided in this case. She has been cooperative in eliciting background information for the defense efforts as well.

**Family Trauma, Physical Abuse, Mental Abuse, and Sexual Abuse**

Cova and her younger sister, Mona, say their father was an alcoholic, and when he drank, he became angry and violent. He started drinking each night as soon as he got home from work.

Cova often saw her father beating her mother with his fists and with weapons. At 6-foot-5, he towered over his 4-foot-9-inch wife. When the fights started, "we would scatter



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

and hide," Cova said. If any of the children tried to intervene, he would threaten them. Sometimes, the beatings happened in the middle of the night and would wake her up.

Cova only remembered the police being called one time, when her father started shooting at her mother. "Back then, the police really didn't do a lot," she said.

They had photos of her mother with bruises all over her, Cova said.

Cova said her father never "beat" her (i.e. – never beat Cova), but she did remember him smacking her across the face two times. Once, it was because she had her finger in her mouth, and he didn't like that. Another time, she started to take food before it was time to eat. Both times were before she was six years old. "I remember it stinging and hurting and knowing to shut up," she said. "I didn't like being disciplined. I didn't want to disappoint." She did her best to be good, and to stay out of her father's way.

He spanked her brothers and sister when they were young, but as the boys aged, he resorted to hitting them with closed fists.

"He was scary," Cova said. "He was a big man. He had a stern look and a stern voice. He was very strong and powerful. Everything about his demeanor was frightening. Especially when he was drinking, it became monstrous."

He started drinking each night when he got home from work. He spent years in the Army, and retired with an honorable discharge. He always had a gun on or near him. He demanded attention, ordering the four children to sit around him while he read and attempted to interpret the Bible. "We were always so scared, we would always just sit there, kind of petrified," she said.

Even when he wasn't drinking, Cova's father was never affectionate. He never told her he loved her. "It was all about his military career, and keeping the house in order," she



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

said. The house had to be neat; The salt and pepper shakers had to be in certain places on the table.

Mona said her father was tough in other ways. He didn't believe in showing emotion and thought they should go to school even if they were sick.

Cova also experienced poverty during her parents' multiple breakups. Her father didn't pay child support while he and her mother were apart. Cova's mother went on public assistance, and worked as a housekeeper. Sometimes, all they had to eat was ketchup sandwiches. They got groceries from a food bank and help from churches with food and presents at Christmastime.

Mona, Cova's younger sister, said she remembered their mom being called to the school office because Cova wouldn't eat lunch. "My sister was embarrassed to do the free lunches," Mona said. "When you get a free lunch, you don't get everything that kids get who pay for the lunch. They used to have us come in and they'd bring in trays with the food."

Cova recalled that she was 7 or 8 years old the first time her parents divorced. They got back together when she was about 10, but divorced again when she was in junior high school. Her father quit drinking for good and her parents remarried for the last time when Cova was in high school.

Richard, Jr. abused Cova physically and sexually. "He was horrible," Cova said. "He had psychotic problems. He was mean. He was abusive." "Being the oldest, he was left in charge of us kids while my mom was working. He would definitely beat us, just being a bully. He did sexually abuse me and my sister for many years." Cova said Richard started sexually abusing her when she was in the first grade, and kept doing it until she was in junior high school. His sexual demands were extensive and ongoing.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

The sexual abuse would occur when their mother was at work or at the grocery store, whether or not their father was living with them at the time. As she got older, her brother would follow her when she left the house, and would make her stop in the woods with him, where he would rape her. She knew when he stopped raping her it was because he had turned his attention to her little sister. She has carried the guilt of that for many years.

When Mona was 18, she told her mother Richard Jr. had been sexually abusing her, but her mother didn't believe her. Mona said Richard Jr. was about to be released from jail and was planning to come back to their house. Mona was afraid he would attack her again. Their mother asked Cova about it, and Cova confirmed that Richard Jr. had abused her, as well. "I'm not sure she truly believed it, but she accepted it," Cova said of her mother.

As an adult, Richard Jr. was abusive to the women he had relationships with, sexually abused his daughters, and according to his sisters was suspected in at least two murders. He spent time in prison in California, tried to join a gang, received a protection order from his wife, and was divorced.

Cova reported she was also sexually abused by a boyfriend of her mothers who lived with them for a while. During what she recalls was her junior high years, Cova remembered two specific times that the man touched her. Once he tried to grope her during a visit to his cousin's house, while they were sleeping in his car. Another time, he came into her room when her mother wasn't there

**Substance Abuse**

Addiction and substance abuse permeate both sides of Cova's family lineage. And all four of the Hunter children have struggled with alcohol or drugs. As seen in the criminal history, Cova was arrested for DUI in 2006, and pled guilty to negligent driving.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

Cova suffers migraines and has a history of dependency on the prescription drugs she used to fight migraine pain. She said she took as many of her prescribed Hydrocodone pills as she could get, and when she ran out, she'd have withdrawal symptoms. Two women at work had migraines, too, and they would share their pills to get each other through the worst pain. When Cova lost her insurance, her sister gave her some pain pills. Cova said it wasn't until after she was arrested in this case that, she knew she had to stop taking the pills.

As documented in the PSI, Cova abuses alcohol. Leading up to her arrest in this case, Cova drank most nights, sometimes up to six alcoholic beverages. Her reasons have been to cope with stress and to cure boredom. When her sister lived with her, she drank with her sister. After moving to Oklahoma and marrying, she began drinking alone, as her husband does not drink.

**Caregiver stresses**

Mona, Cova's younger sister, said a lot of responsibility was put on Cova, and she took care of everyone in the family financially. From the time Cova started working in high school, she managed their finances well and gave her mother money each pay day, Mona said. Later, she bought herself and Mona cars. (Their father bought cars for their brothers.)

When her mother worked, Cova was expected to be home looking after her younger siblings. "I had to take care of things in the house growing up," she said.

Cova said she didn't have kids she played with growing up, and she didn't make friends at school. She was shy, and the isolation her father had imposed at the stayed remained, even when he wasn't there.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

Cova remembered doing fairly well in school, despite not having any help with her homework. Her mother couldn't help her because she couldn't read or write English, and her father wasn't there.

In high school, she didn't do any extra-curricular activities. She took marketing and business classes and ran the school store during her junior and senior years. She started working at McDonalds as part of her classwork.

She wasn't particularly drawn to business. Her dream was actually to become a teacher, but she wanted to make money and help her mother feed her and the other kids.

After graduating from Clover Park High School, she didn't even finish a year of community college before deciding to work instead. She became a shift manager and then a store manager at McDonald's.

Cova felt the pressure of needing to care for everyone. That continued throughout her parents' lives. "It was my obligation," Cova said. "I didn't feel any resentment."

Despite her father's cruelty and abuse throughout her childhood, she took him in when he was ailing. Cova bought a house in Lakewood in 1997 and moved both her parents in with her. Her father, she said, turned into a sweet man in his old age, and she learned about some of the hardships he'd endured as a child. He died on November 25, 2001.

Mona said her mother took care of his father until he died, helping to wash him, and emptying his urinal. "That's probably where I get it," said Mona, who is a certified nursing assistant who has worked for MultiCare Hospice for 26 years. "You just have to do what you got to do. Cova's the same way."

In 2006, Mona moved in with Cova to help her care of their mother, who had severe asthma. After Cova's father died, her mother used his medication to self-medicate herself.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

She became septic and she shed skin like a burn victim. She also had a heart problem, and required daily care. "One of the most rewarding things in my life was to take care of my mom," Cova said. Cova wanted to repay her mother for doing so much for her and her siblings when they were children. "She was also my best friend," Cova added. Her mother died in 2008.

**Medical problems**

As previously mentioned, she also suffered from debilitating migraines. She said she tried everything for relief, including acupuncture, acupressure and getting bled. She turned to narcotics 20-30 years ago.

She had appendicitis in approximately 2014, and when doctors took her appendix out, they found her ovarian cancer.

During her cancer treatment, Cova's doctor suggested she stop the chemotherapy because she was so unhealthy. She became neutropenic. No one was allowed to visit her; healthcare workers came and scrubbed her body every eight hours. She got a pulmonary embolism. Doctors found a mass in her lungs, but the biopsy was too difficult for her and they had to stop. She developed liver problems in 2016, as a result of her cancer treatment.

Mona said Cova went to work every day while she was going through chemotherapy, even as her health worsened.

"She couldn't breathe," Mona said. "She had no hair."

Cova was independent. Mona thought if she hadn't lived with Cova, she wouldn't even have known she had cancer. Cova drove herself to the chemo appointments, even though it was clear she needed help. "She called me a few times because she couldn't find her way home," Mona said. "We lived in Lakewood our whole lives, in the same area our



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

whole lives, and she couldn't find her way home." "She's always been self-sufficient. She never needed anybody's help."

Cova has never sought counseling. "I just tried to tough everything out and deal with it," she said.

After she finished her chemotherapy, she got extremely depressed. "I got suicidal," she said. "I wanted to die. I was trying to figure out ways to die." She went to see a doctor (David Kennel) about it, and he put her on an antidepressant, Venlafaxine. She still takes 300 mg of it daily. She doesn't feel depressed anymore.

**Employment at PCHA**

Cova loved working at the Housing Authority. "I loved the work," she said. "I was always challenged by it. The work we did to help people was really rewarding. I didn't get much chance to interact with the population we served, but every time we did interact with them it was just joyous and fulfilling." "I liked the challenge of it. I liked the challenge of making all the pieces fit."

Cova cried as she talked about stealing from the agency. She said she didn't know where the greed she felt came from. She said she wasn't thinking clearly. She was performing poorly at work and struggling with her health problems.

"I've hurt so many people: people related to me, my friends, family, the people I served over the years, my employees. It breaks my heart." She said she was glad she got caught because it was tearing her apart and wanted to escape. Afterward, she tried to make sure she gave back everything she could.

She hopes to serve her time and then come back to be with her family. She wants to work again.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

**Current Family Life**

Cova met her husband, Jonathan Campbell, through an online chat room on a gaming web site. She said he was easy to talk to, and they liked the same music. Jonathan Campbell said Cova's personality drew him. "She was just down-to-earth and seemed like a good person to me," he said. She flew to Oklahoma to meet him, and they got married in 2018.

Cova has become close to her stepsons, who are 10 and 14. "I think they love me, and I love them," Cova said.

Jonathan is a paramedic and also runs a trucking business, so Cova spends a lot of time with his sons. She's really good with them," he said. "It really surprised me how she was around them, how she made them comfortable."

During the past year, Cova has helped them with their schoolwork while they were attending classes online. Although the boys spend every other week with their mother, they came to Jonathan and Cova's house to attend school during the day while their mom was at work.

It's allowed Cova to do something she always wanted to try – do the job of a teacher.

In their free time, Cova takes the boys fishing, frogging, and hunting. They ride four-wheelers and wash the truck.

Jonathan said the main reason he stayed with Cova after finding out about her crime was because of his kids. "We take 'em bowling, we take them fishing," he said. "We eat at the family dinner table every night." Cova does all the cooking. Jonathan loves the roast she makes with vegetables. She also cleans and does the family laundry.

He said he knows she regrets what she did, in part because of how much it hurt him. He said they don't talk about it much, because it makes him angry when he thinks about it.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

He is afraid of what will happen while she is in prison. Without her help while he is working, he fears that he will have to go back to seeing his sons every other weekend instead of having joint custody.

**Making Amends**

Since being confronted by the gravity of her crime, Ms. Campbell has actively participated in a process of repossession of goods and has attempted to assist in mitigating the degree to which she owes restitution in this case. She has made herself available to the civil process involved in a lawsuit designed by the PCHA to recover funds – including being deposed, and including physically turning over both real and personal properties, not to mention livestock and vehicles.

In large part due to Ms. Campbell's cooperation, the PCHA has recovered a net $1,697,010 to date.

Upon the sunsetting of the civil case, an auction of assets, and surrendering of banking assets, Ms. Campbell was arrested for the related and present charges, and soon made herself available for entry of a plea to begin the process of coming to justice for her offense.

Ms. Campbell agrees the Pre-Sentencing Report accurately chronicles her life. Further, the defense agrees with Adverse Childhood Experiences (ACEs) references and asks the Court to factor those into the sentencing considerations.

## SENTENCING RECOMMENDATION BY DEFENDANT

The defense recommends the Court sentence Ms. Campbell to 37 months incarceration. The defense advocates the Court more heavily weigh the factors from 18 U.S.C. § 3553(a) than the United States Sentencing Guidelines calculation in Ms. Campbell



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

case. Any conviction will impose difficulty for the rest of Ms. Campbell's employment future and be with her for the rest of her life. Clearly the ACES issues explored throughout the PSI include factors that have led Ms. Campbell to her place before this Court, and clearly these same issues are matters this Court can assist Ms. Campbell to overcome as it crafts a sentence that is sufficient, but no greater than is necessary to satisfy the court's sentencing objectives.

**Guidelines Calculation**

The defense and the U.S. Attorney's office have reached an agreement as to the appropriate application of the United States Sentencing Guidelines calculations. Probation seems to have adopted the same. In brief, that calculation is as follows:

| | |
|---|---|
| Base Level | 7 |
| Loss Amount | +18 |
| Abuse of Trust | + 2 |
| Acceptance of Responsibility (3E1.1(a)and (b)) | -3 |
| **Total Offense Level** | **24** |

As the Court is well-aware, sentencing courts are free to disagree with the Guidelines' recommended sentence in any case and may impose a different sentence based on a contrary view of what is appropriate under § 3553(a).

**THE COURT SHOULD SENTENCE MS. CAMPBELL TO SERVE 37 MONTHS CONFINEMENT.**

Ms. Campbell urges the Court to sentence her to 37 months confinement.

A 37-month sentence satisfies the 18 USC § 3553(a) factors, and is appropriate for this case. A sentence of this duration considers Ms. Campbell's offense conduct, punishes



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

her sufficiently, and facilitates the opportunity to return her to a position in society where she can embark on a healing journey and personal and professional growth with new skills that will include decisions that are not clouded by her substantial trauma.

The statutory factors are set forth within 18 U.S.C. § 3553(a):

> (a) Factors to be Considered in Imposing a Sentence.
>
> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection. The court, in determining the particular sentence to be imposed, shall consider
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

The defense's recommendation is sound upon consideration of the § 3553(a) factors, as follows:

*A. The Nature & Circumstances of the Offense and the History and Characteristics of the Defendant.*

The offense conduct is fully addressed in the PSI. Ms. Campbell is before the Court regretful on many levels. She regrets her opportunistic and greedy behavior. She regrets the ignoble end to what should have been an honorable career following decades of hard work. During the course of civil litigation, Ms. Campbell located and produced property that was obvious and property the plaintiff's agents were unaware of. She even suggested ways to maximize recoveries, but of course, let the party decide how to go about things.

Ms. Campbell's history and characteristics are discussed at length throughout previous sections of this memorandum. The Probation's pre-sentence report provides the Court with a reasonably detailed summary of Ms. Campbell's life history, including facts supporting the referenced ACES score. A view of Ms. Campbell's life shows that the high point of her experiences was the success and satisfaction she experienced while working at the PCHA. Given Ms. Campbell's extensive exposure to several varieties of untreated trauma throughout the majority of her life, it was inevitable she would face situations in which clarity of judgment would be clouded.

*B. The Seriousness of the Offense, the Need to Promote Respect for the Law and the Need to Provide Just Punishment.*

The defense agrees a term of incarceration is appropriate to satisfy the court's objectives for just punishment. Wire Fraud and the associated loss were offenses of opportunity. An important agency that serves the community was impacted negatively. There has been no shortage of media coverage of this case, and the US Attorney's office has



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

published press releases on it. There is a certain level promoting respect for the law that has already occurred, addressing the seriousness of Ms. Campbell's offense.

*C. The Need to Afford Adequate Deterrence.*

Arguably, there is nothing more the Court can do to deter Ms. Campbell from further similar criminal conduct. Daily, she has loathed over the consequences of her actions on all the victims. She was beyond embarrassed when word got out for the reasons all of the property was being sold and auctioned. She participated in ways that she hoped would be perceived as helpful. It was tiring and rigorous. 37 months incarceration followed by supervised release will continue to deter Ms. Campbell; the time she has already spent reflecting and regretting will deter Ms. Campbell from future criminal acts.

*D. The Need to Protect the Public.*

There are conditions the Court can place on Ms. Campbell's supervised release that will protect the public from future similar harm. For example, the Court can prohibit Ms. Campbell from holding a position of financial trust in her future occupations.

*E. The Need to Provide the Defendant with Education or Vocational Training or Rehabilitation.*

This empowers the Court to assist Ms. Campbell through a healthy journey addressing alcohol and narcotic abuse, as well as her upbringing that was clearly filled with multiple adverse experiences. The Court is specifically asked to recommend Ms. Campbell as a referral to the RDAP program. Additional conditions sanctioned by Probation in the PSI are reasonable as well.

Ms. Campbell needs assistance with pursuing education and training. A term of supervision will give Ms. Campbell the opportunity to interface with resources she is



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

currently not familiar with – job skills training, employment resources, and possible mental health care or therapy.

*F. The Need to Avoid Disproportionality Among Defendants with Similar Records who have been Found Guilty of Similar Conduct.*

This type of case is very difficult for making comparisons. Sentencing results vary widely. Standing alone, the loss amount is not a meaningful metric. The better course is a wholistic view of not just the offense, victim, and loss amount, but personal characteristics, and Ms. Campbell's responses to that which was asked of her during civil litigation and the process of recovering what remained.

*G. The Need to Make Restitution to Victims.*

Ms. Campbell's case includes substantial restitution. The only way Ms. Campbell can make meaningful deposits toward fulfilling her restitution requirement will be to have as much time possible available to work for what will certainly be a life-long term for fulfilling this obligation.

## CONCLUSION

Respectfully, the defense urges that upon the Court's consideration of the Guidelines and of the § 3553 factors, a sentence of 37 months incarceration, and supervised release would be appropriate. While fashioning the proper sentence, the Court is asked to facilitate Ms. Campbell's interest and need for education, need for further job skills, and her desire to remain clean of alcohol and free from abusing substances.

Ms. Campbell requests the Court recommend her BOP placement be as near to her home in Oklahoma as possible, to assist her in maintaining family support.



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

For the reasons cited herein, as well as the reasons cited within the PSI, the Court should sentence Ms. Campbell to a term of 37 months incarceration.

RESPECTFULLY SUBMITTED the 20th day of August, 2021.

HESTER LAW GROUP, INC., P.S.
Attorney for Cova Campbell

By: */s/ Lance M. Hester*
Lance M. Hester
WSB #27813



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157

CERTIFICATE OF SERVICE

Lee Ann Mathews, hereby certifies under penalty of perjury under the laws of the State of Washington, that on the date set forth below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record for the plaintiff and co-defendants, if any, and hereby certify that I have mailed the document by U.S. Postal Service to Cova Campbell, defendant.

Signed at Tacoma, Washington the 20th day of August, 2021.

*/s/ Lee Ann Mathews*
Lee Ann Mathews



HESTER LAW GROUP, INC., P.S.
1008 SOUTH YAKIMA AVENUE, SUITE 302
TACOMA, WASHINGTON 98405
(253) 272-2157